Case number 18-568 Michael S. Evans Appellate v. Federal Bureau of Prisons. Mr. Holzblatt for the amicus curiae, Mr. Walker for the affiliate. The case number 18-568 is a case of a defendant, Mr. Walker, who is a former member of the Federal Bureau of Prisons.  May it please the Court, Ari Holzblatt appointed amicus for appellant Michael Evans. This appeal is about just how thin a record the government can present to a court to justify withholding or not searching for records under FOIA. The Bureau of Prisons withheld completely a video showing another inmate assaulting Evans with a screwdriver, and it refused to search for records that could show how that screwdriver made it into the prison. But it failed to provide various facts needed to establish that withholding or not searching for those records was lawful, leaving the District Court with a legally insufficient basis to grant summary judgment. Starting with the video, my plan is to first address Exemption 7E, then segregability, and then Exemptions 7C and F. Exemption 7E applies only to disclosure of specific and unknown law enforcement techniques or procedures that threaten circumvention of the law. The Bureau invoked 7E on two grounds. First, it said prisoners might use the video to circumvent surveillance in the F.C.I. Gilmer dining hall. But critical facts are missing from the record, namely whether the cameras are hidden and whether footage from even one camera would disclose blind spots. The three features on which the government relies aren't enough, that the footage shows several different camera angles, that it demonstrates the location of cameras, and that it shows the field of view during the assault. The government's submission was thin. You're absolutely right about that. But why isn't it almost self-evident that the tape would show what the government, what the prison can see, and therefore would also reveal the blind spots, what they can't see? I don't know whether there are blind spots in the F.C.I. Gilmer dining hall. There are obviously multiple cameras that surveil the dining hall, as there were multiple angles shown on this video alone. If there are no blind spots, then revealing what the cameras here can show would not threaten circumvention. Now, it may be that there are blind spots, and it may be that on remand, the government, in its declaration, will be able to substantiate. I understand and I know that we have cautioned that it is not to be the norm for the court to make an in-camera inspection in FOIA cases, but we've never said the court can't. Matt, this might have been a good occasion for the court to examine in-camera to see whether there were, in fact, blind spots. Absolutely, Judge Sintel. I think that's the, when the, as this court actually said in the Campbell case, where there's a question of this sort about whether the record is sufficient, the solution is for the court to review the documents in-camera rather than to passively accept an agency's unsubstantiated exemption defense. And as Your Honor said, the record here is thin. I think that record could either have been supplemented by an adequate declaration that substantiated the threat of circumvention. It could also have been supplemented by the court reviewing the video. We don't have the video. The court didn't have the video. And so we are entirely dependent on the Bureau, which does have the video, to explain what can be seen here. A note of why the It's a fair point that perhaps Chief Judge Howell could or should have looked at this more closely. But on the other hand, I mean, there's a little bit of unfairness to her when we have very competent counsel on appeal coming in and making a set of arguments that weren't presented to her below. When this issue was teed up to her, the government moved for summary judgment under Exemption 7, your client didn't even contest the applicability of the exemption. He just said, this is segregable and I want the video for a specific purpose, which can be controlled. It doesn't need to be put out in the public. It can be privately viewed. So she never had a chance to consider any of that. is to categorically exempt prison surveillance video. That means that video showing excessive force by guards, video showing preventable inmate deaths, denial of medical care would all be withheld. And that would frustrate FOIA's purpose, which is to inform citizens about what their government is up to. So I think in this circumstance, it is incumbent on this court to get the law right in light of the record that is here and I presume why the court appointed media amicus to present these issues to the court. I do want to talk, your honor, about... I don't read their 70 paragraph as even saying there are blind spots. I don't read the declaration as saying that there were blind spots. They were worried about disclosing. That's correct, your honor. The declaration does not say that there are or are not blind spots. The methods employed in responding doesn't reference preventing detection, but that could be using other inmates to screen your activities. That doesn't mean there's blind spots on the cameras. That's right, your honor. And I think this is where... It doesn't say, though, that there are blind spots. It just says that they could disclose blind spots. It doesn't mention blind spots? The declaration doesn't mention blind spots? As I read it. It does not say that there are blind spots. It doesn't say there are? That's right. The government's brief speaks to hypothetical blind spots. The record does not speak to blind spots or not blind spots. And this is exactly, if there are a concern about blind spots, it's something that could be put in the record. It doesn't even reference a concern about disclosing whether or not there are blind spots in the declaration. I'm sorry? It doesn't even reference, I can see why they might want to say we've got blind, they don't want to say we've got blind spots. They don't want to get out of there. They just say, they don't even reference as a 7E interest here, a concern about whether revealing, revealing whether there are or are not blind spots. That's right, your honor. I do want to address the question about... I mean, they say location of video cameras, which is not the greatest formulation in the 7E paragraph. They also have in paragraph 10, they say the video shows several different camera angles, which seems a little bit closer to saying this would expose the range of our field of vision. Your honor, I agree that the field of view during the assault, the camera angle and the location of the video cameras is revealed by the video. That's true of all video. All video inherently reveals those three features, but not all video reveals blind spots in a surveillance system, because some surveillance systems successfully surveil the area without blind spots, and some do not. And that's where more information is needed in a FOIA context, where the description that has been provided could lead to exempt records, or it could describe non-exempt records. We need more information from the government to be able to distinguish between those two options. Does the record show, I guess my assumption, but it could be ill-informed, is that there are a lot of guards around? Does the record show anything about that? All the record says is that BOP guards responded to the assault, so presumably there were guards either in or outside the dining hall, and they were able to respond to the assault. As I said, I wanted to turn to segregability. I want to make sure to touch on that. The government's other explanation for fully withholding the entire video is that it can't blur the faces in the video, and so must withhold all the footage under both Exemption 7C and 7F. I think both of the 7C and 7F concerns would be addressed if you could blur the images. Assume that the concern is law enforcement circumvention because of blind spots, just for the sake of argument. That would be inherent in the video. There would be no way to segregate to protect that piece of information. Your Honor, I don't believe that all video discloses blind spots. Some does and some doesn't. I understand. If the court believed that disclosing this video would disclose blind spots, then I agree that segregation… It's a different… If you really want to proceed, then, would it not be likely that at least there could be screenshots that could show the very instances around the time of the alleged incident without revealing anything about blind spots? Because you're showing only one camera's results if you use something like screenshots. Absolutely, Your Honor. That would be ultimate segregability that you could segregate out five or six screenshots or two or three screenshots without revealing anything along what they're worried about. That's correct, Your Honor. And, in fact, the… In terms of technology, they could bring their 14-year-old to do that. Your Honor, I agree with you about how easy it would be to do that. The declaration does say that there are multiple camera angles shown, and I think one option as well would be to only show video from one of the cameras instead of from multiple cameras, and then there would be knowledge that there were still other cameras surveilling the dining hall. On the segregability question, which I did want to make sure to touch on, this blurring the faces concern, the only explanation the government offers is that they don't have the technology to blur the faces. That's not the test under this Court's law. The test for whether the records are inextricably intertwined is, one, would they impose significant costs, and there is nothing in the record. It would be akin to the government saying that it can't redact names and addresses from a document because it doesn't have black markers or Adobe Acrobat. This Court, I think, would say go buy them, and that's what it should say here unless doing that would impose significant costs. If the Court doesn't have any further questions, I want to reserve… Go ahead. Sorry. I was going to reserve my time for rebuttal, but if the Court has further questions… We'll give you some time for rebuttal. I had a question about the other issue, the FOIA request for records involving the screwdriver. What I was wondering is, this is an unusual case where there's actually been litigation in another federal court, West Virginia, and I guess ultimately the Fourth Circuit, on the allegations that this was a BOP screwdriver or that it was related to anything the BOP owner did. And there are actual factual findings in that litigation that whatever this was, it wasn't BOP's. They didn't know where it came from. It didn't belong to them. So why isn't that, putting aside the formulation of this amended FOIA request, why wouldn't that just control the answer to whether they did an adequate search? There's already findings that they've got. It's not theirs. They've got no records. Would that not bind us here? So I don't believe it's… Federal estoppel? I don't believe it's binding, but I also, the critical fact that's missing in the record here is who the FOIA office spoke to at the prison about whether this was a BOP. That's what I'm trying to ask is, is that critical when you already have a factual finding and fully litigated issue in litigation involving the very client, I'm sorry, the person you represent is amicus in this case, the appellant here, that it's not, we already have a finding. There's no one to ask. No matter who you ask, the answer is, it's asked and answered already, and that is it's not theirs. It's not one of their tools. It's not something they know anything about or have any paperwork about. Shouldn't that be the end of that? Well, so Your Honor, and I'm going to get into the weeds of what I think Mr. Evans, who I don't represent, but who I think what his theory is and why I think he would want an opportunity to develop the adequate search record on this issue. The affidavit that was submitted in that litigation was from the tool officer, the tool room officer. Mr. Evans' theory appears to be that this is an accessory to maintenance or recreation equipment, and it may be that the person most familiar with maintenance and recreation equipment in the prison is not the tool room officer but is someone who manages the maintenance and recreation equipment. And so what could happen, and I just don't know because Mr. Evans didn't have an opportunity to litigate this issue because this was not the ground that was decided below, is if the government were to submit the affidavit from the tool room officer, Mr. Evans might say, well, I don't think that's an adequate search because what you have to do is ask the person most likely to be familiar with this tool. What I've said in my request is that it's an accessory to maintenance and recreation equipment. I would like you to ask that person. And so I think that's the reason why we argued in our brief that the right step here is something to remand, to reverse on the one issue that I think even the Bureau agrees is wrong, which is that requesting existing records in the form of a question is still a request for existing records, and then let this other issue of search be developed factually below. Just back to the video for a second. On the question of remedy, you made a couple of references to things the district court might do on remand. So would you be satisfied if we were to set aside the district court opinion, send it back and leave open for her the question of whether to ask the government for a more elaborate affidavit or view the video in camera or whatever, as opposed to just an outright reversal which says turn over the video? So I want to be careful how I answer, Your Honor, because I don't represent Mr. Evans. And so Mr. Evans filed a fourth brief, a surreply or a — and there was actually a debate below whether he had cross-moved for summary judgment or not. That being said, in many FOIA cases, what often happens, and it happened, for example, in the Crewe case, where a concern about the thinness of the record was the main concern for the court, this court remanded and exactly what you just described, Your Honor, happened, which was that the government was given an opportunity to actually conduct a new search. Well, there's also a case from 1998, the Summers v. Department of Justice, where it did not involve video, but it did involve questions of segregability where the district court had not made a detailed review supporting the segregability order. We did exactly that. Although it didn't involve videotape, we did send it back to the district court for further proceedings and asked for the district court to give us a record that explains why it was not segregable. Even though, under the summary judgment rule, we could theoretically do this ourselves, because we are taking it in notes. But in that summary opinion, we did say that summary judgment just wouldn't work that way. We really couldn't do this ourselves with any judicial efficiency at all where the district court could. So this would be at least analogous to that, although that involved written documents rather than involved secret files of Jeg or Hoover. Where this involves videotape, it still would be the same kind of principle. So a remedy, an appropriate remedy, could be to send it back for that kind of proceeding. Could it not? I think you're right, Your Honor, yes. Thank you. Thank you. Good morning, Your Honors. May it please the Court. Johnny Walker with the United States Attorney's Office on behalf of the Bureau of Prisons. I would like to take up the issue of blind spots. I believe Amica seems to assume that unless the Bureau can prove that there are blind spots in its cafeteria, that we have failed to meet our burden under Exemption 7E. Yeah, why isn't that a good proposition? Well, let's start with the 7E test. We know from Blackwell and from Mayor Brown that it is a low bar. What the Bureau has to show is that there is a chance of a reasonably expected risk of circumvention of the law. How could the district court find it was reasonably expected on this? Because what we know from the record is that disclosure of the video would reveal multiple camera angles in the dining hall. We know because Mr. Evans requested all responsive videos of this. Do we know that there are any blind spots? We don't know that there are blind spots, but what we do know – In the world, can this be a reasonable reason for – I mean, the presumption is you have to disclose under FOIA. You're telling me under Exemption, the burden is on you. So if all you can say is, well, there might be a possibility that something could be disclosed, how does that meet your burden? What I submit, Your Honor, is that there do not have to be blind spots because there are multiple cameras. I'm hearing you submit, but I'm not hearing why. Well, there are multiple cameras in the dining hall for a reason, because the Bureau's surveillance system attempts to capture activity in the dining hall from multiple angles. If we reveal multiple security angles, even if it does not reveal a blind spot, it would allow an inmate to direct their activity away from at least those camera angles and thereby create a – Does the record show whether the cameras are visible or not? The record does not show whether the cameras are visible. I think it's – Is it kind of important to? It is somewhat implied because the – It's somewhat implied? Well, the declaration says that the videos would reveal the location of the cameras, which indicates, I believe, that the cameras are not visible. But what is really the concern, and this is expressed in the declaration – Wait, I'm sorry. Are not visible? That's correct, because it does say that it would reveal their location. But what is really concerned, and this is expressed in the declaration, what is the concern is that revealing the area captured by the cameras would permit an inmate to modify their behavior to avoid detection. And that doesn't necessarily have to be finding a blind spot. It could simply be directing activity away from the several camera angles that would be revealed by releasing this record. Are there guards usually in this room as well? I'm sorry? Are there usually guards in this room, or is it kind of a free-for-all? There were guards in this case. We know that there were prison officials who responded. Right. I'm sorry? Right, okay. So you have to avoid cameras and guards. Right. To have a blind spot. Right. But, I mean – But we don't know anything about whether guards are there, too, or – We do know that there were guards. How really likely is it you're able to hide conduct? It may well be, but I just don't know what the record is that shows that someone could really circumvent detection. Under the standard, under the low bar established by Blackwell and Mayor Brown, where we only have to show a chance of a reasonable expected – Reasonable expectation is what we refer to a problem. A chance of a reasonable – Can you come in here and say, well, it could be that there are – Now, how would you distinguish between areas where they would direct their activity and blind spots? I'm so uncertain what the distinction is. I'm going to go ahead and call them blind spots. But is it sufficient to just come in here and say there could be blind spots, therefore we won't reveal? I think it is sufficient to show, Your Honor, which we have done, that by revealing this video, it would permit a prisoner to at least avoid a substantial number of cameras in the prison dining hall. There are multiple cameras – Unless you got away from all of them, why would it do them any good to avoid a substantial number of them? Well, I mean – As long as there's a camera on you, you're in trouble. I suppose the coverage is perfect. Well, I mean, we certainly would know that at least if you're able to avoid three camera angles, that's three less camera angles that the Bureau has to investigate and observe criminal activity. And under the low bar established by Blackwell, I think that – No, they would still have to investigate and find out whether it was there or not. If they've got – say there are four cameras. I don't know if there's four or 12, but say there are four cameras, even if they know that three of them might not have good coverage at that moment, they'd still have to go and look. There certainly would be an – It would eliminate them, wouldn't it? Yes. My point, Your Honor, is that there would be – the tools that the Bureau would use in that investigation, at least some of them would be less effective because the prisoners would be able to avoid detection by a series of cameras. Wouldn't it still be a good idea for us to have a record on which we would know whether or not this is true before we allow summary judgment on the question? I think – Summary judgment presupposes that there is no substantial question of material facts. That's correct, Your Honor. And you're telling me that the possibility that something could exist is good enough to survive that? Applying the facts in this record to the low bar set by Blackwell and Meagher-Brown, yes, there is – there's enough facts in this record to know that the prisoner will be able to – it's black and white in the declaration that inmates will be able to avoid – modify the behavior to avoid detection by several cameras in the dining hall. Well, no, that's – it's just to prevent detection. It doesn't sort of say exactly how they're going to do it, right? And it doesn't actually assert fines. I mean, there's a lot of – I think it may not be the most rigorous bar in the law, but when you keep emphasizing a low bar and then you say, let's rely on implicit stuff and read between lines, that seems to really dilute your burden to virtually nothing. Well, I don't mean to do that at all, Your Honor. I do think it's black and white in the declaration that this would reveal multiple camera angles. What do you have? You have in paragraph 21, which is specific to 7E, you have an assertion, the footage also demonstrates the location of video cameras. That's it. That's correct. And then I had to rummage around a little bit to find paragraph 10, which is not specific to 7E, but even if we give you that one, that says the video shows several different camera angles. Correct. Just a little bit more, but still a good bit less than what you say in your appellate brief, which is areas under surveillance, and even that doesn't have a lot of meat to it. I think that is captured, Your Honor, in the last sentence of paragraph 21, where it says that the release of this information could result in prisoners modifying criminal behavior to prevent detection and circumvention of the methods of law enforcement officers used to discover the existence of an investigative company. That sounds like you're just asserting the legal conclusion that we would then write an opinion granting of holding a 7E exemption. That sounds like, right, that's the legal test we would do, but we need the facts to get from these rather thin assertions to that conclusion. It can't just be that you say this is a prison. We watch people. Therefore, disclosing something will cause bad consequences, cause them to avoid detection. There's got to be a little more meat on the bones, doesn't there? Well, I think the conclusion in the last part of 21. I'm just saying there does have to be more meat on the bones than just making that conclusion. Correct? If all we had was the last paragraph, the last sentence of paragraph 21, I think that your statement would be, I would understand. So what else do we have? What else do we have besides that sentence plus the two that I read to you? Well, I think it flows naturally from the two that you read, Judge Katz. So we know that this would reveal multiple camera angles. Right. We also know some things that are just sort of knowable and inherent. We know that this is all of the cameras that captured this particular assault because we produced all the responsive video. So this is all the cameras that captured this particular assault. We also know from the nature of it. But all the ones that capture this assault, it's not necessarily all the ones that capture activity in this room to the extent you're worried about disclosing blind spots. That's correct, Your Honor, but we know that it would be. You've actually essentially just said that you wouldn't necessarily disclose blind spots. You're only going to have the cameras that happened to capture whatever portion of the room this was in. Those are the only ones that are going to be relevant. You're not going to show blind spots because you're not going to disclose the cameras that didn't cover the room but didn't cover the assault. Not necessarily, Your Honor. I thought that's what you just said. That is not what I just said. There may not be any other cameras. And I want to point out that. We don't know. We don't have any facts. We don't know that for sure. We know at least that we have all the cameras that captured this. Well, you all know. We just, the court wasn't told. Your client, maybe not you personally, but your client knows, actually does know, but didn't bother to include that information in the declaration. We at least know, well, yes, they included the information that there are multiple camera angles. We know inherently that it would be all the camera angles that capture this assault. And we know inherently from the nature of video footage, it would reveal both the angle and the outer boundaries captured by each of those cameras. And that is really what is of concern. But that's not, to be clear, first of all, anytime you have a video camera, it's going to disclose what it surveyed, what it saw. Exactly. That's just, so when you say video cameras and the view, that's really just showing one thing as far as I'm concerned, not two things. And then, as you said, these are the, you only got, what you collected in response to this FOIA request, sensibly, was only the video cameras that covered, that showed anything about the assault. Is there any assertion here that says that will disclose all the video cameras in this area? No, Your Honor, but I think to clear the test established by Blackwell and Mayor Brown, we don't have to show that the disclosure will completely render ineffective the Bureau's detection devices and its security system. By revealing multiple of the camera angles, it at least substantially weakens the robustness of its surveillance system. There are multiple cameras in this dining hall for a reason. It's not revealing what's not covered. I'm sorry? It's not revealing, if it doesn't, if what is responsive to this FOIA request is not going to reveal what's covered in this room as a whole, then I guess I'm not quite understanding how it's going to reveal. Well, say what's responsive to a FOIA request will reveal. I suppose the answer would be, you know, the prisoners know to a certainty that parts of the room are covered, and that leaves open the possibility that other parts aren't. That's a better off in the other parts, but... It would at least permit a prisoner to modify their behavior so that it would avoid detection by the camera. But wouldn't that, I mean, it seems like that should be the kind of thing that you have to explain if it's true. Yeah. Well, I think, I mean, I think it is inherent in the nature of the video that would be revealed. It would obviously reveal what the particular camera angles capture. Where does this declaration explain why Judge Santel's suggestion about segregability couldn't be undertaken, that you could show specific screenshots or zoom in enough so that you wouldn't be showing the outer limits of the camera angle? Where is that addressed in this declaration on segregability? It doesn't say that. A screenshot would still certainly reveal the outer boundaries of the area captured by the camera. But one camera at one moment. Is that really revealing anything that you've got a right to keep from the public? I mean, FOIA assumes that you're going to be disclosed. You have to come up with something good enough to fit one of these enumerated exemptions and saying that, well, a screenshot wouldn't show the things that aren't in the screenshot. But is that really a good enough explanation to get out of your FOIA obligations? Yes, Your Honor, because it would reveal the angle of that camera and the outer boundaries of that camera. And we're going to get a direction that there are other cameras, and certainly the ability to focus could change the amount of information revealed about even the boundaries of that camera, if that were enough by itself, which is a good question. But don't you really need a whole lot more in the record before we can find that there's any kind of will? Does this have any kind of fit with the exemption? Frankly, I'm not sure how we could conduct that segregation without – because what Mr. Evans is asking for – Well, perhaps an in-camera review by the judge, a detailed explanation of whatever this explanation is you're talking about, about whether it would reveal areas that you won't call blind spots but to which inmates could direct their activity that I would call blind spots. It's explaining whether those exist or what the chances are of their existing. You really don't see those things as possible? I think, frankly, Your Honor – Come on. I think, frankly, Your Honor, that would require some modification of the request by Mr. Evans because what we have is he has requested all video that captured that particular instance. Is it really unusual for the result to be, in a four-year case, a limited grant of what the person's asking for, not a full grant? Does he really have to modify it now to what the court could modify it in an order? Well, I mean, because what he has requested is all of the responsive video. Yeah, sure. And the court could say, no, I'm going to order segregability done, and you're only going to get part of it. What's the problem with the court doing that? He doesn't have to change his application for a court to order a segregable release. That happens all the time. I don't see how the Bureau itself could determine which part of that. I mean, we can't make the decisions for Mr. Evans. We have segregability claims all the time that the agency suggests or that the court orders. There's nothing unusual about this. How can you know that? But here, the whole of what he has requested is – information that will disclose what you're concerned about. The maximum. So it doesn't that he has to come in and say, here's the minimum I want. You have to disclose the maximum, and anything you don't disclose, you will have to justify as implicating this interest. And if you – what happens is agencies go, we can give you 70 percent, and here's how we can do it. The rest we have to withhold because it creates risks of circumvention of law enforcement. So I think – I don't mean to speak for Judge Chantel. That's all he's saying that you should do is what agencies do all the time. If I may respond, Judge, I think the problem is the whole of what he has requested is exempt. And it's – I don't see how the Bureau could – Every segregability case under FOIA is given someone less than the whole of what they asked for, by definition. I understand. But I don't see how the Bureau could take it upon itself to determine which particular screenshots or which particular cropped areas would be of interest to Mr. Evans. I also – My question was of interest to him or not. It's whether it fits your exemption or not. You keep trying to push the burden back the other way. You're supposed to be able to show that it fits the exemption. You don't care what he's interested in. That's not the question for you or the Court. I understand, Judge Chantel. I will note that we have a number of other exemptions that we've claimed over the video. The Court need only find one. Well, I want to ask you about one element of those. Certainly, Your Honor. As far as the personal invasion of interest to privacy, is there really an interest to privacy in something that shows only the presence of a person at a place where they are known to be anyway? That's not all it shows, Your Honor. This shows a prisoner-on-prisoner assault and officer response. Yes, yes, yes. Prisoner-on-prisoner assault is something that really goes to what FOIA is designed for. You show what the government is up to, and if the prisoner is able, then the public will know whether the prisoner has made an appropriate response. But forget about that for the moment. As far as the other individuals involved, the 70 or more that you mentioned in your brief, I think, is there really an invasion of their privacy when all of these inmates are known to be in that dining room? They're seen by each other and the guards. Is their privacy really invaded? I think absolutely, Your Honor. I think there's a big, for a couple of reasons. Number one is there's a big difference in the privacy that a person, someone not knowing that they are present in prison. I think there is a much deeper invasion of privacy, so there would be an image of that person in the jumpsuit in the prison dining hall. The other reason is that this Court's case law holds quite clearly. I'm sorry. Just to be clear, so the privacy, I don't know, does it have to do with they're in a dining hall, or it's just you say the image of them in a prison uniform? It's much more evasive just to show the image of the person present in the system, present in the prison, rather than just a result of a BOP inmate. The other reason, though, I think is much more important. Sorry, if I could just show up. So that assumes that you're disclosing faces, identifiable faces? I think, well, another point there, Your Honor. We have images in paragraph 19. Right. They're images of persons. Well, does images mean identifying? Yes. I think a person can be identified. Well, the image could be the back of the head, could be the side of the head. That doesn't make it unidentifiable. I think a person particularly. Don't you have to show that it's, they were, these 70-plus people were going to be individually identifiable? No, Your Honor, because I think it flows naturally that an image of a person allows that person to be identified. The image of the, is the image of my back an image? To someone who knows you, I think an image of your back would be identifiable to you. And these are inmates who live in an environment with each other on a day-to-day basis. They probably see each other in this dining hall every day. And I think, yes, an inmate could identify another inmate from their back, perhaps because of body type, perhaps because of a tattoo, perhaps because of haircut. But, yes, an image of a person from any angle could be identified. And your argument as to why you can't, let's assume it's identifying all 70 people that were in the area, it's actually identifying them to the public. Because I think the interest is identification to the public, not to people who saw you there and already knew you were there, right? Well, it's to everyone. The public. Right. Including people. The other prisoners already knew Joe was there, right? They may or may not, Your Honor. I think, for instance, these. And the answer we got on why you couldn't blur or block anything out was BOP doesn't have the technological capability? That's correct. It does not have the technological capability. Really? I mean, as Judge Sintel said, my daughter will come over and do it for us. She'll put a cat face on everybody if you want. Right? This is as easy as can be these days. I understand. And I noticed that the appeal was taken to the Justice Department's Office of Information and Privacy. Are you going to tell me that the Justice Department is not capable of blurring a face in a video? That's what our declaration says, Your Honor. I mean, that does take a particular technology that the BOP does not have. I know the district court has affirmed. Would it be sufficient under FOIA to say, here's the documents we requested. We can't turn any of the documents over because we don't have black markers? No, certainly not, Your Honor. Because you'd be expected to go spend some de minimis amount of money to buy the black markers or the Adobe nowadays, right? Or some other means of. There is a showing here that the acquisition of the technology needed to blur faces or block them out was not something readily available to BOP. Either it is part of the Justice Department, which I have to believe has this technology, or that they could acquire it at virtually no cost. That is not in the record, Your Honor. Is that your client's burden to put that in the record? All that the record says is that, and I think this meets the requirement for a reasonably detailed declaration. But it does say that they do not have the technology. But that would be the same thing. We don't have any markers. And that would be sufficient in your view, then? I think that situation is a little more unbelievable, given the tonality. I'm not sure in this day and age it is. I take your point, Your Honor. I wanted to get back. I have one more response to Judge Sotelo, if I may just take a moment. The other reason that this is protected privacy information, Your Honor, is this Court's case law holds that in law enforcement records, the identities of witnesses, law enforcement personnel are... I'm aware of that. Okay. And so that's what we have here. I'm not saying that under any and all circumstances, the mere showing of an image is enough to be an unwarranted invasion of privacy. I don't think it is. Well, it's... I'm saying there is language you can take out that says the showing of an image is invasion of privacy. It's certainly identified... And I think under this Court's case law, identifying information in a law enforcement record is necessarily implicative privacy. Well, I think it's necessarily when you're talking about people who have an interest in not being associated with law enforcement or associated with criminal activity, associated with investigations. That's witnesses on the outside, maybe victims, those types of things. The cases where I've seen it is the privacy interest in just not being associated with this whole thing the government is doing, which seems to me a little bit of a stretch to say that's going to apply to people in prison. But, again, Your Honor, it's not just people in prison. There was an actual law enforcement situation captured by the video, and that's why it's responsive. There was an inmate on inmate assault. There was officer intervention. There are witnesses to that inmate on inmate assault. But the witnesses were all inmates? Or, I'm sorry, are you saying the witnesses were private people or inmates? The witnesses are inmates and possibly other prison personnel. But the interest is, I mean, even though they're prisoners, they are witnesses in a law enforcement situation identified in a law enforcement record, and that gives rise to a privacy interest. And you'd like us, you're talking about the precedent we'll be making about prison regulation, you'd like us to bring a precedent that says go ahead and do what you want to, and nobody's going to be able to tell because we'll be compelled to tell because we're protecting their privacy. And can three inmates do that one? No, Your Honor. I mean, well, the purpose of FOIA is to find out what the government is up to. Even when there's a privacy interest, that can be overcome if there's an evidence you're showing. And what the government is up to in this case, or what he's asking us to find out is what the government is up to, is are they shielding the identity of somebody who committed a serious crime? I think based on the claims in his lawsuit, he said in his FOIA request that he wants us to support his lawsuit. He is claiming that the Bureau of Prisons acted negligently in responding to the assault and in disciplining him following the assault. Yes. And would not that be what the government's up to? Yes. And if they're not up to that, then the disclosure will be that they're not up to that. But this seems to be classic FOIA type information. The problem, Your Honor, is that under Favish, he has to make a specific evidentiary showing that there was, in fact, or that a reasonable person could. Before he gets FOIA? Absolutely, Your Honor. No, Favish was different because this is a balancing test, which the district court didn't do. And what you had in Favish was that there had already been extensive disclosures, extensive studies, extensive reports. And it was in that context when someone said, well, I still don't believe it all, I want to see it, that the Supreme Court said, you've got to come up with something more. I hesitate to disagree with Your Honor on the meaning of Favish, but my understanding is that Favish creates, as this Court has interpreted it, there is an evidentiary showing that must be made where the public interest asserted is discovering government malfeasance or negligence. There must be an evidentiary showing from which a ---- He just wants to show what if he takes out the word malfeasance. He wants to see what happened. He wants to see what the government did. He was busy getting stabbed at the time. He'd like to see what the guards were doing. Maybe it will make him feel very appreciated and want to send thank you notes to the guards. I think that gets into precisely the problem that Favish sought to avoid. What Favish sought to avoid was the ability to simply articulate anything and then overcome self-esteem. No, no, the whole point of FOIA is you don't have to have any, you can have good reason, bad reason, no reason at all. You submit a FOIA request. What happened in Favish was the balancing, right? You had privacy interests that were identified. Correct. And then what was asserted as a public interest on the other side was, well, I just, I want to test. I don't believe what the government's telling me. That's my public interest. I want to see that private information to show that the government's not telling me the truth. In the face of already substantial disclosures, studies, reports, and investigations by the government. Here, you're trying to say it's an upfront burden before we even ask the district court to do balancing. There was no balancing here. So it seems to me you're moving the goalposts. I think when the interest asserted is that we want to show government negligence, and that's what Mr. Evans has asserted. The general rule is, for a FOIA request, you don't have to show any reason at all. Congress created a right to get that information. That's your right. You don't have to show any reason. Before we get into the question of what the reasons are, is when there's a balancing or when we're talking about the fee waiver. Now, the fee waiver, we're talking about what the public interest is. Now, the balancing, as far as the initial right, before the exemptions come into question, he doesn't have to show any reason for them. He just wants to know what the government says to him. That's what Congress created. You said that yourself. I know it's just the general rule of FOIA. I think that the case law has created a different test to overcome the substantial privacy interest under the balancing test. Yeah, that's the balancing. When you get to that point, then it's when you get the question about what you're talking about, what his interest is in it. But even here, there is a public interest, not just his private interest. Public interest, if the Bureau of Prisons is not handling inmate misconduct and serious crime by inmates correctly, then there's a public interest in knowing that. Or there's an interest in knowing that they're doing a crackerjack job. But there must be an evidentiary showing from which a reasonable person could believe that that might have occurred under the case law. All right. All right. Thank you very much. Thank you, Your Honor. Please affirm. Mr. Holzblatt, do you have any time left? We'll give you two minutes, Mr. Holzblatt. Your Honors, I'm happy to answer any questions, but otherwise I'm actually happy to waive the rebuttal. So if there are no questions, but if there are, I'm happy to answer. All right. Well, Mr. Holzblatt, you are appointed by the Court to represent the appellant as amicus. We appellants arguments in this case, and we thank you for your assistance. Thank you, Your Honor. Thank you, Court. The case is submitted.
judges: Millett, Katsas, Sentelle